FILED

2016 Mar-14  PM 12:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

| | | |
|---|---|---|
| SANDREW DOSS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No. 4:12-cv-02718-WMA-HGD |
| | ) | |
| LT. WILLIAM NORTHCUTT, et al., | ) | |
| | ) | |
| Defendants | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Sandrew Doss, hereinafter referred to as the plaintiff, through appointed counsel, filed an amended complaint pursuant to 42 U.S.C. § 1983 alleging that rights, privileges, or immunities afforded him under the Constitution or laws of the United States have been abridged during his incarceration at the St. Clair Correctional Facility in Springville, Alabama.  (Doc. 33).  The plaintiff names Sybil Ragsdale, William Northcutt, Sr., and Shirley Nunn as defendants.  The plaintiff seeks compensatory and punitive damages, interest, costs and attorneys' fees.  Plaintiff also has demanded a trial by jury.

## I.  Case History

Plaintiff originally filed a *pro se* complaint.  (Doc. 1).  He alleged that Lt. William Northcutt, Officer Tish, Officer Ragan, Officer Nunn, Nurse Toliver, Nurse

Ragsdale, Officer Line, and Medical Director Wheat subjected him to cruel and unusual punishment, in violation of his Eighth Amendment rights, by failing to provide him with constitutionally adequate medical treatment for a hernia.  On March 15, 2013, a report and recommendation was entered, recommending that plaintiff's claims against Lt. Northcutt, Officer Ragan, Officer Tish, Officer Nunn, Nurse Toliver, Officer Line and Mr. Wheat be dismissed pursuant to 28 U.S.C. § 1915A(b)(1) and/or (2), and that the Eighth Amendment claim of cruel and unusual punishment against Nurse Ragsdale be referred to the undersigned magistrate judge for further proceedings.  (Doc. 9).  The report and recommendation was adopted and accepted by the district court.  (Doc. 13).

On May 29, 2013, defendant Ragsdale was ordered to file a special report in response to plaintiff's allegations.  Ragsdale filed a special report on July 3, 2013.  (Doc. 18).  Plaintiff was informed that the special report would be considered as a motion for summary judgment and afforded 20 days in which to file a response.  (Doc. 24).  Plaintiff filed a response on October 29, 2013.  (Doc. 26).  The court deemed the motion for summary judgment moot on May 21, 2014, based on the filing of an amended complaint.

On February 7, 2014, R. Thomas Warburton, Charles F. Spainhour and Carlyn Emily Miller filed notices of appearance on behalf of plaintiff.  (Docs. 28, 29 and 30).

Thereafter, the court allowed counsel for plaintiff to file an amended complaint on plaintiff's behalf, which was filed on April 25, 2014.  (Doc. 33).  The amended complaint names as defendants Lieutenant William Northcutt, Sr., Officer Shirley Nunn and Nurse Sybil Ragsdale.  Defendant Ragsdale filed an answer to the complaint on May 5, 2014, and defendants Northcutt and Nunn filed an answer on May 23, 2014.  (Docs. 36 and 43).  The court then entered a scheduling order based on the parties' planning meeting report. (Doc. 45).  The court extended the deadlines twice on the parties' joint motions.  (Docs. 48, 49, 65 and 66).

Defendant Ragsdale filed a motion for summary judgment with exhibits on April 30, 2015.  (Doc. 69).  Defendants Northcutt and Nunn filed a motion for summary judgment with exhibits on April 30, 2014.  (Doc. 71).  On June 4, 2015, after obtaining an extension of time, plaintiff filed a response to the motions for summary judgment.  (Doc. 80).  Defendant Ragsdale filed a reply on June 16, 2015. (Doc. 81).  Defendants Northcutt and Nunn filed a reply on June 20, 2015, which the court deemed timely filed.  (Doc. 84).

## II.  Summary Judgment Standard

In considering a motion for summary judgment, the court must determine whether the moving party is entitled to judgment as a matter of law.  Summary judgment may be granted only if there are no genuine issues of material fact and the

movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party.  *See Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000).  The burden of proof is upon the moving party to establish his *prima facie* entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1989).  Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Bennett v. Parker*, 898 F.2d 1530, 1532-33 (11th Cir. 1990).

As the Eleventh Circuit Court of Appeals has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a *prima facie* case.  "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial."  Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof.  This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett v. Parker*, 898 F.2d at 1532 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

### III.  Factual Assertions/Summary Judgment Facts

Based on the foregoing summary judgment standard, the following facts are undisputed or, if disputed, taken in a light most favorable to the plaintiff.

Plaintiff, Sandrew Doss, is an inmate of the Alabama Department of Corrections.  At the time of the events made the basis of his complaint, he was incarcerated at the St. Clair Correctional Facility.  In February 2012, plaintiff was incarcerated in Disciplinary Segregation A Block – cell A-8.  (Doc. 69-2, Doss Depo., at 30-31).  Between approximately 6:00 a.m. and 8:00 a.m. on the morning of Sunday, February 12, 2012, plaintiff was exercising in his segregation cell.  After exercising, he noticed a pain in the right side of his stomach.  Plaintiff started to feel worse by approximately 10:00 a.m. that morning.  He started throwing up at approximately noon.  According to plaintiff, he initially notified the segregation pill call nurse and thereafter called the cubical officer in his cellblock, informing them both about the problem in his groin area.  The pain and the vomiting got steadily worse during the day on February 12, 2012.  Plaintiff did not get much sleep on the night of February 12, 2012, due to the pain.  (*Id.* at 81-104).

On Monday morning, February 13, 2012, plaintiff again told the pill call nurse that he was in pain. The pill call nurse, according to plaintiff, told him that she would get him assistance at the health care unit. Plaintiff testified that he began throwing up blood due to the fact that he did not have any more food in his stomach. There was a burning and swelling in his groin area. (*Id.* at 104-15). Sometime around noon on Monday, February 13, 2012, plaintiff was viewed through the tray door at his cell by a correctional officer who saw his hernia. Thereafter, the officer informed plaintiff that he would get help from medical. (*Id.* at 116-24).

Thereafter, plaintiff says he communicated with not only the Cube Officer Shirley Nunn, but also Nurse Tolliver and Correctional Officer Lynn, and informed them of the pain he was experiencing. (*Id*. at 169-70, 172-81). According to plaintiff, Officer Lynn looked through the cell tray door and saw blood on the floor of the cell. (*Id.*). Officer Lynn then informed plaintiff that he was going to get him medical attention. (*Id.* at 181-83). Doss repeatedly told all of the segregation pill call nurses and correctional officers of the pain he was experiencing but not one of them provided any assistance. (*Id.* at 188-94).

Officer Nunn allegedly eventually came out of the cube and told him that she had communicated with the shift office and the infirmary, and further stated that Nurse Sybil Ragsdale said that Doss was not going to be seen in the infirmary and

that he should merely sign up for sick call.  (*Id.* at 197-99).  Doss never had any personal communications with defendant Sybil Ragsdale at any time between February 12 and February 14, 2012.  Plaintiff does not claim that he heard any telephone conversations between Officer Nunn and Nurse Ragsdale.  (*Id.* at 234-46, 308-11).

On the morning of Monday, February 14, 2014, two correctional officers escorted plaintiff to the infirmary to be seen by medical personnel for an unrelated issue on a previously set appointment.  (*Id.* at 271-72, 308-11).

During February 12-14, 2012, plaintiff was seen at least eight to ten times a day either by correctional officers or by nurses during segregation pill call.  During that time, plaintiff would have received three meals a day, an opportunity to exercise, three pill calls a day, and two body counts.  However, there is no documentation showing that plaintiff stated to any of the pill call nurses, or ADOC personnel, that he was in any state of medical emergency on February 12, 13 or 14, 2012, prior to being taken to the infirmary.[1]  There is nothing in plaintiff's medical file or ADOC documentation to indicate that plaintiff had any kind of medical problem prior to

---

[1] The lack of documentation goes to the weight of the evidence but is not dispositive on the question whether plaintiff voiced any complaints of pain to correctional officers or pill call nurses.

10:10 a.m. on February 14, 2012, when he was taken to the health care unit and thereafter to Cooper Green Hospital.  (*Id.* at 126-36).

The evidence is that plaintiff suffered from an incarcerated, non-reducible hernia with bowel obstruction on February 13, 2012.  A strangulated hernia is undisputedly a serious medical need.  Dr. William Talley saw plaintiff in the health care unit at St. Clair at approximately 10:15 a.m. on February 14, 2012.  He diagnosed plaintiff with an incarcerated, non-reducible right inguinal hernia and called an ambulance to transport plaintiff to Cooper Green Hospital.  (Doc. 69-23, Talley Aff.).  By the time he was taken to Cooper Green Hospital on February 14, 2012, the medical record reflects that the condition had been present "approximately 24 hours," that he was suffering from nausea and vomiting, that he was in severe pain, and that he was in critical condition.  (Doc. 80-1).  Plaintiff was returned to St. Clair on February 17, 2012, after surgery.  He remained in the infirmary until his release into general population on February 20, 2012.  When Dr. Talley saw plaintiff for follow-up appointments on February 21, February 28, March 6 and March 13, 2012, his notes indicate that plaintiff's pain was well-controlled with medication and he experienced no post-surgery complications.  (Doc. 69-23, Talley Aff.).

Dr. Willard Mosier is the head of emergency medicine at Cooper Green Hospital located in Birmingham, Alabama.  Dr. Mosier was the admitting physician

for Sandrew Doss on February 14, 2012. He was also the Medical Director for Prison Health Services in Alabama from 2003 through 2007. (Doc. 69-24, Mosier Depo., at 5-13). As the emergency room physician, Dr. Mosier admitted plaintiff into the emergency room and ordered and reviewed the initial blood and urine studies. Dr. Mosier took plaintiff's medical history and performed a physical evaluation. According to Dr. Mosier, the lab test results did not indicate that plaintiff had been vomiting or had lost blood. There was also no evidence of any dehydration or malnourishment. Dr. Mosier testified the tests were inconsistent with plaintiff's claims of throwing up for two days and also throwing up blood. (*Id.* at 17-19, 26-55, 64-76, 107-109). However, he acknowledged that there could have been some blood in plaintiff's vomit caused by irritation of the esophagus from frequent vomiting. (*Id.* at 67-68).

Ragsdale was the RN charge nurse on duty on the relevant dates. Plaintiff admits that he has never met Ragsdale and never had any communications with Ragsdale. His allegation against Ragsdale is that Nunn allegedly told plaintiff that she had called Ragsdale and that Ragsdale refused to admit plaintiff into the infirmary. (*Id.* at 234-46, 308-11). However, defendant Nunn testified she does not know Ragsdale and denies ever calling Nurse Ragsdale on February 13, 2012. (Doc. 69-3, Nunn Depo., at 202-03, 314). Nunn also avers that had she been aware that

plaintiff was in a state of medical emergency, she would have had the correctional officers transfer him to the health care unit. She would not have called the charge nurse on duty to ask permission to bring an inmate to the Health Care Unit and would not have had the charge nurse come to the segregation unit to see plaintiff. (*Id.* at 169-80).

On June 9, 2012, some four months after the incident in question, plaintiff filed a medical grievance, which stated as follows:

> Back in February (12-14th), 2012, for two days straight I tried to get to the infirmary because I couldn't eat, was in excruciating pain, due to a "golf ball size" lump in my stomach near my navel area. Every time Ms. Nunn (officer) or any other officers tried to call the infirmary to be seen, I was informed that Nurse Ragsdale kept denying me medical care. For two days I was vomiting blood and could barely walk or breathe without feeling any pain. On February 14, 2012, I so happened to be seen by the nurse at sick call due to an unrelated issue and once Dr. Talley saw me, he immediately determined that I needed to be rushed to the "free world hospital" where I was sent to Cooper Green Mercy Hospital for an emergency hernia extraction surgery. I had to stay at Cooper Green for three days and once I returned back to St. Clair, I was admitted into the infirmary for three more additional days. I have still been enduring pain but not as severe and if Nurse Ragsdale had of been about her job and seeing me, my near death crisis could have been earlier detected. I would appreciate an investigation into her conduct as well as a reprimand because I will seek legal punishments against her!

(Doc. 69-2, Doss Depo., at 303-09; Doc. 71-5, Northcutt Depo., at Ex. 2).

Officer Shirley Nunn has been a correctional officer for 25 years. (Doc. 69-3, Nunn Depo., at 24). For the last several years, Nunn has been a Cube Officer in the

segregation unit.  As a Cube Officer, Officer Nunn sits in the cube and keeps watch over the 24 disciplinary segregation cells.  There is a bathroom in the cube and Officer Nunn testified she never leaves the cube for any reason during her shift. Rather, there are correctional officers assigned to go in and out of the segregation unit who communicate with the inmates and communicate any needs back to the Cube Officer. (*Id.* at 88-93, 112-13, 147).  Nunn claims that no individual, whether an ADOC employee or segregation nurse, ever informed her at any time during February 12-14, 2012, that plaintiff was in any state of medical need.  (*Id.* at 184-91).

Plaintiff alleges in his amended complaint that he was in a state of medical emergency from February 12 through February 14, 2012, "languish[ing] in his cell, suffering from excruciating abdominal pain, inability to eat and vomiting blood." (Doc. 33 at ¶ 27).  The only time that Officer Nunn worked during this period was from 6:00 a.m. to 6:00 p.m. on February 13, 2012.  (Doc. 69-3, Nunn Depo., at 280, 193).  Officer Nunn testified that she does not know Sybil Ragsdale, has never talked to Sybil Ragsdale, and to her knowledge has never met Sybil Ragsdale.  (*Id.* at 202-03, 313-14).  As a Cube Officer, if Nunn is made aware that an inmate in segregation is in a state of medical emergency, she calls the ADOC sergeant and/or lieutenant on duty and informs them that a correctional officer is bringing the inmate to the health care unit/infirmary to be seen by the medical staff.  (*Id.* at 170-78).

Alternately, she testified that if an inmate expressed a medical need to a pill call nurse, the nurse would advise the shift clerk or tell the infirmary about it. (*Id.* at 144-46).  If an inmate is found to be in a state of medical distress, the standard procedure is to make a notation in the Department of Corrections' logs.  There is no notation from February 13, 2012, indicating that plaintiff was in a state of medical emergency. (*Id.* at 183-91).  Officer Nunn testified that she never told plaintiff that she spoke to Nurse Ragsdale at any time between February 12, 2012, through February 14, 2012. (*Id.* at 313-14).

Sybil Ragsdale worked as a licensed R.N. from 1986 through 2012.  (Doc. 69-4, Ragsdale Depo., at 19).  Ragsdale was employed with Corizon as an R.N. at the St. Clair Correctional Facility for two and half years.  In July of 2012, Ragsdale was terminated from her position at Corizon for allegedly failing to assess a patient in the infirmary.  According to the inmate, Ragsdale refused to see and/or evaluate him for chest pain.  Due to the inmate's allegations, Ragsdale was dismissed from her position at Corizon.  She did not contest the decision by Corizon to terminate her due to the fact that she was in severe pain from a 2002 automobile accident and, in fact, has not worked in any capacity since her dismissal from her position at Corizon after being awarded disability benefits.  (*Id.* at 21-35, 120-32).  Officer Nunn and Nurse Ragsdale only worked on the same shift at the St. Clair Correctional Facility for a

three and half hour period, from 2:30 p.m. through 6:00 p.m., on Monday, February 13, 2012. Plaintiff was taken to the infirmary at 10:10 a.m. by Correctional Officers Tish and Downing on the morning of February 14, 2012. (*Id.* at 86-90). From 2:30 p.m. until 5:00 p.m. on February 13, 2012, there was a doctor on duty at the Health Care Unit. (*Id.* at 90).

Edwina Hamby, RN, is currently the Health Services Administrator (HSA) at the St. Clair Correctional Facility. Nurse Hamby was the Director of Nursing (DON) at St. Clair in February 2012. (Doc. 69-5, Hamby, Aff., Doc. 69-6, Hamby Depo., at 9-12). The ADOC logs show that plaintiff received medication from the segregation pill call nurses at 2:32 a.m., 12:15 p.m., and 9:08 p.m. on Monday, February 13, 2012, and at 2:24 a.m. on Tuesday, February 14, 2012. There is no notation that Doss raised any concerns with the segregation pill call nurses regarding any pain associated with an inguinal hernia during the time period from February 12 through February 14, 2012. (Doc. 69-5, Hamby Aff., Exhibits).

When the segregation pill call nurses deliver medications to inmates in segregation, the pill call nurses are escorted by one and sometimes two ADOC officers. The pill call nurse has the segregation inmates' medications contained in an envelope. The inmate places his hand through the tray door in his cell door and the segregation pill call nurse places the medication onto the segregation inmates' hand.

Thereafter, the segregation pill call nurse watches the inmate take the subject medication. If the inmate at any time has any problems with his medication or other health care concerns, he is free to communicate with the segregation pill call nurse. (Doc. 69-5, Hamby Aff.).[2]

Hamby became aware of plaintiff's allegations about Ragsdale after plaintiff filed a grievance in June 2012. The grievance stated that Ragsdale refused to see plaintiff in the Health Care Unit after receiving a call from an Officer Nunn, and that plaintiff had been having problems with a hernia and vomiting blood. Subsequent to receiving the grievance, Hamby and Clayton Wheat, the Administrator, interviewed Ragsdale. Ragsdale informed them that she did not recall receiving any phone calls at all with regard to plaintiff in February 2012. Ragsdale also stated she knew that she did not receive any calls regarding any emergency medical needs, specifically, bloody vomiting, due to the fact that if she had received such a call she would have had the inmate immediately transferred to the Health Care Unit. Ragsdale told them that if she did in fact receive a phone call, which she denied, and if she was told that

---

[2] Some inmate witnesses have testified that some of the pill call nurses hurry through pill call and do not stop long enough at any cell to allow an inmate to voice any complaints. (Doc. 69-32, Gregory Fuller Depo., at 24-25; Doc. 69-33, Brandon Simon Depo., at 92-93; Doc. 69-35, Chris Gunn Depo., at 133-34). There also is testimony that if an inmate expresses a need for medical attention to a pill call nurse or correctional officer, for anything short of chest pains, the inmate is told to fill out a sick call request slip. (Doc. 69-32, Fuller Depo., at 22-23, 31 -32, 34, 64).

it was a non-emergency situation, which she denied, she would have told the ADOC officer to tell the inmate to fill out a sick call request form.  (Doc. 69-6, Hamby Depo., at 15-28).

However, plaintiff has submitted evidence of an email exchange between Edwina Thomas (Director of Nursing at SCCF) and Linda Young of Corizon Health Care that indicates Ragsdale received a call from a correctional officer about plaintiff. Ragsdale told Linda Young that the officer who called never said plaintiff was vomiting blood, so she advised that if it was not an emergency, he should sign up for sick call.  (Doc. 80-3).

In February 2012 Hamby was in the process of changing the health care policy at St. Clair with regard to inmates in segregation.  Prior to Hamby being hired as the DON at St. Clair, in approximately December 2011, the policy was to have inmates complaining of non-emergency medical problems in segregation to fill out sick call slips and to be seen at the next available sick call by a health care provider.  Inmates would only be transferred to the Health Care Unit if they were in a medical emergency.  However, according to Hamby, they were transitioning to a new policy that all inmates would be seen in the Health Care Unit regardless of whether their medical complaint was an emergency.  (Doc. 69-6, Hamby Depo., at 34-37).

Due to the fact that Nurse Ragsdale only worked as needed, Hamby was unsure whether Ragsdale had been trained as to the new policy.  Therefore, Ragsdale was not reprimanded with regard to the new policy.  Ragsdale, instead, received some verbal education with regard to the new policy pertaining to health care of inmates housed in segregation and was instructed that, in the future, all inmates, regardless of their medical complaints, should be personally seen immediately in the Health Care Unit. (*Id*. at 35-37, 56-57).

Subsequent to Doss' grievance, on June 9 2012, an incident involving David Boy Fuller occurred.  On June 24, 2012, Fuller arrived at the Health Care Unit complaining of chest pains.  Fuller alleged that Ragsdale refused to assess him and wrote a medical grievance against Ragsdale.  An investigation was conducted by the health care staff, including Clayton Wheat who took several written statements regarding the incident.  It was determined that Fuller was, in fact, in the Health Care Unit and that Nurse Ragsdale informed Fuller that if he was not in a medical emergency that he needed to complete a sick call request.  Due to the fact that Ragsdale refused to assess Fuller after he complained of chest pains, a recommendation for termination was written up by Hamby.  (*Id.* at 21-23, 33-34, 53).

The initial recommendation for termination made no mention whatsoever with regard to Doss.  However, when Linda Young from HR first received the initial

recommendation for termination, she emailed Hamby and asked if Ragsdale had any prior complaints.  Hamby responded by noting the previous complaint by plaintiff. HR wanted the information about Doss included in the recommendation for termination due to the previous verbal education.  The incident involving plaintiff was only placed in the recommendation for termination due to the verbal education provided to Ragsdale.  (*Id.* at 52-59).

Virginia Henry is a Licensed Practical Nurse (LPN) fully licensed to practice nursing in the state of Alabama.  Henry is currently employed by Corizon at St. Clair, and was so employed in February 2012.  (Doc. 69-7, Henry Aff.).  As an LPN, Henry performed segregation pill call duties.  To fulfill this duty, Henry took prescribed medications to the inmates housed in the segregation unit.  The segregation cells have a tray door at the bottom of each door to the cell.  The tray doors are to pass the food trays through to the inmates in the segregation cells.  (*Id.*).  The ADOC's duty post logs show that Nurse Henry conducted segregation pill call, escorted by ADOC personnel, on February 13, 2012 at 9:08 p.m.  (*Id.*).  Henry conducted the pill call in the segregation unit and provided medications to plaintiff, who was located in cell A-08 in the segregation unit.  (*Id.*).  Had plaintiff been in medical distress on February 13, 2012, at the time that Henry was performing segregation pill call, she would have immediately notified the medical staff at the health care unit and an

ADOC Officer would have transported plaintiff to the Heath Care Unit. (*Id.*). However, Henry states that at no time did plaintiff inform her on February 13, 2012, that he was in any kind of medical distress or needed emergency medical treatment. (*Id.*).

Misty Butler is an LPN fully licensed to practice nursing in the state of Alabama. Butler was employed by Corizon as an LPN in February 2012. (Doc. 69-8, Butler Aff.). The ADOC duty post logs show that Butler conducted segregation pill calls, escorted by ADOC personnel, on February 12 and February 13, 2012. (*Id.*). On the morning of February 13, 2012, at 2:32 a.m., Butler provided medications to plaintiff. Butler states that at no time did plaintiff inform her on February 13, 2012, that he was in any kind of medical distress or needed emergency medical treatment. (*Id.*).

Christopher Lind is currently a Correctional Officer at St. Clair. As part of his duties in February 2012, Lind worked in the segregation unit where plaintiff was housed. (Doc. 69-9, Lind Decl.). Lind has no independent recollection of February 2012, but according to the Cube Officer's logs, at 6:13 a.m. on the morning of February 13, 2012, he performed a security check on the inmates housed in A-1 segregation unit. Later on February 13, he escorted inmates for exercise and mental health appointments and also escorted the pill call nurse through the segregation unti.

He stated that if plaintiff appeared to have (or told him that he had) a serious medical need, Lind would have notified the Cube Officer on duty and the inmate needing care would have been taken to the Health Care Unit.  He also stated that no segregation inmate advised him that plaintiff needed medical care.  *Id.*

Jonathan Ragan is currently a correctional officer at St. Clair.  As part of his duties in February 2012, Ragan worked an assignment in Segregation Unit A-1. (Doc. 69-10, Ragan Decl.).  Ragan performed a security check in the segregation unit on February 13, 2012, at 7:10 a.m. and also escorted segregation unit inmates to exercise at 9:27 a.m. on that same date.  Again, on February 13, 2012, at 3:30 p.m., Ragan served chow to the inmates  in segregation.  While Ragan states he does not have any independent recollection of the events of February 13 and 14, 2012, apart from escorting plaintiff to the infirmary on February 14, he denies plaintiff's allegations that he threw up blood, cried out for help, refused food, informed correctional officers of needing medical help, or that other inmates continuously and loudly called out for plaintiff to get medical help at any time between February 12 and February 14, 2012.  He claims that he would have remembered had any of that occurred.  (*Id.*).

In similar declarations, other correctional officers who worked in Segregation Unit A-1 during the relevant time period deny that plaintiff was throwing up blood,

refusing food trays or crying out for medical help, or that other inmates were asking officers to get help for plaintiff.   Again, they premise their denials not on any independent recollection, but on the absence of notations in the duty post logs and their assertions that they would have remembered something like that.  (*See* Doc. 69-11, John Mason Decl.; Doc. 69-12, Gerald McMillian Decl.; Doc. 69-13, Andrew Shorter Decl.; Doc. 69-14, John Downing Decl.; Doc. 69-15, Michael Anderson Decl.; Doc. 69-16, Larry Baker Decl.; Doc. 69-17, Joel Christian Decl; Doc. 69-18, Brian Fife Decl.; Doc. 69-19, Jajuan Howard Decl.; Doc. 69-20, Charles Kelly Decl.; Doc. 69-21, Kevin Mackesy Decl.; Doc. 69-22, Corey Martin Decl.; Doc. 69-37, Joe Mangione Decl.).

Plaintiff testified in his deposition that he was housed in the A-1 segregation unit in February 2012.  (Doc. 69-2, Doss Depo., at 30, 33).  He receives medication daily for high blood pressure and high cholesterol and for his heart.  (*Id.* at 57-58).  He also has received mental health care in the past and had a previous diagnosis of schizophrenia, but he no longer takes any medication for that.  (*Id.* at 59-60, 289).  On the morning of February 12, 2012, he was exercising in his cell when he felt a sharp pain around the pubic area.  (*Id.* at 81-82, 87).  The pain would come and go.  (*Id.* at 89).  On the morning of February 12, there was no swelling or nausea.  (*Id.* at 92).  The pill call nurse told plaintiff if the pain worsened, he should tell the cubicle

officer or let someone know, and they would try to get him to the infirmary. (*Id.* at 94, 143-45). However, after the midday pill call, he threw up. (*Id.* at 94-95). By the evening of February 12, he was throwing up on a regular basis, and by February 13, there was blood in the vomit. (Id. at 99, 101-02, 110-11). He was also in pain. (Id. at 97-99, 103).

Plaintiff acknowledged that he was visited at his cell by a pill call nurse and security escort three times a day during the relevant period. (*Id.* at 139). The pill call nurses told plaintiff they would get him to the infirmary and get him checked out when pill call was over, but no one ever came to get him, despite his reports to them that he was in pain and gagging. (*Id.* at 77-78, 122, 140, 158-60, 191, 236). No pill call nurse actually evaluated plaintiff. (*Id.* at 248-49). By February 13, plaintiff felt a burning sensation and a knot began to form. (*Id.* at 113). Plaintiff hollered to Nunn; at one point, plaintiff testified that she came to plaintiff's cell and saw the swelling (*id.* at 114), but he also testified that she only looked at him from the cubicle (*id*. at 165, 169). Plaintiff also testified that he started banging on his cell door around noon on February 13, and Nunn came out of the cubicle door to find out what was going on. Plaintiff told her he was in pain, throwing up blood, and needed to see a doctor. She told plaintiff she would call the infirmary and went back into the cubicle and closed the door. (*Id.* at 173-74). Later on February 13, plaintiff again

talked to Nunn, and she told plaintiff she had called the shift commander's officer and the infirmary and could not do anything else.  (*Id.* at 179-80).

Plaintiff testified that he also showed the blood, vomit and swelling to Officer Lind,[3] a pill call escort, who told plaintiff he would tell the shift commander's office and infirmary.  (*Id.* at 122-23, 176-79).  He also testified that Sergeant Mason came to his cell after he threw up and said something had to be wrong with plaintiff because he had not eaten.  (*Id.* at 132).  Plaintiff further testified that he saw Nunn talking to Sergeant Ragan, after which Ragan came to his cell and told plaintiff he would get him some help, but no one came.  (*Id.* at 180, 182-83).  Plaintiff did not fill out a sick call slip because he was in too much pain.  (*Id.* at 125).  He also did not eat on Sunday, Monday or Tuesday (February 12, 13 and 14).  (Id. at 137-38).

Plaintiff saw Northcutt on the sidewalk outside the segregation unit in the afternoon of February 13 and hollered to him, telling Northcutt he was in pain and vomiting.  Northcutt replied he was tired, going home and did not care.  (*Id.* at 185-86, 188).  Other inmates in the unit were hollering to Nunn in the late afternoon of February 13 to try to get help for plaintiff, but she told them she had done all she

---

[3] Although plaintiff has referred to this officer as "Officer Lynn," it is apparent from the record that "Officer Lynn" is actually Christopher Lind.

could do.  According to plaintiff, Nunn said "the woman over there ain't going to see him" and said plaintiff should sign up for sick call.  (*Id.* at 193, 197-98).

On the morning of February 14, Officer Tish and Officer Downing came to get plaintiff for an unrelated sick call for which he had already signed up (*id.* at 271), and plaintiff heard other inmates telling the officers that he had been "screwed up" since Sunday (February 12).  Plaintiff heard one of the officers say "that's just old Sandrew.  He's just an old mental patient.  He'll be all right."  (*Id*. at 117-19).[4]  When they looked in his cell and saw the vomit, they took plaintiff from his cell to the infirmary.  (*Id.* at 119-20).  By the time plaintiff saw Dr. Talley on February 14, he was still vomiting blood and gagging.  (*Id.* at 75-76, 272-74).

Alex Walker was incarcerated at SCCF in February 2012, and housed in the A-Block.  (Doc. 80-4, Walker Depo., at 9).  He testified that an inmate informed Northcutt that plaintiff was in pain and needed to see a nurse, but Northcutt was dismissive.  (*Id.* at 17).  Plaintiff was complaining that his stomach was hurting and he was not eating his meals for two days.  (*Id.* at 29-30).  Close to the time for shift change on February 13, plaintiff got Nunn's attention by hollering for her.  She came

---

[4] Nunn and Northcutt testified that they consider plaintiff an "aggressive," "dangerous" and "disruptive" inmate, who throws trays, yells at other inmates and is on "walk-alone" status.  (Doc. 69-3, Nunn Depo, at 179; Doc. 71-1 through 71-4, Northcutt Depo., at 92-93).  Northcutt described plaintiff as "a danger to the officers."  (Doc. 71-1 through 71-4, Northcutt Depo., at 93).

to the door in the cube so that she could hear, and inmates advised her that plaintiff was in pain and needed to see a nurse.  However, Walker did not observe her call for anyone.  (*Id.* at 30-31, 54-55, 62-63).  About 30 minutes later, Northcutt came in A Block, and plaintiff hollered for him.  Walker testified that Northcutt spoke with plaintiff, and plaintiff told him he was hurting and needed to see a nurse, and that he was throwing up blood.  However, Northcutt walked off, telling plaintiff he would be alright.  (*Id.* at 31-32, 69-70, 75-76).  Walker stated that plaintiff was complaining of being in pain to anybody who passed by his cell, and other inmates in the block were also trying to get him help.  (*Id.* at 36, 79).  Over time, plaintiff's voice became weaker and he was in too much pain to keep hollering, so inmates in the block, including Walker, were beating on doors and hollering to try to get plaintiff some assistance.  (*Id.* at 36, 65, 80-81).  Despite the efforts of the inmates to get help for plaintiff, no prison official or medical staff helped him.  (*Id.* at 71).[5]

Chris Gunn was an inmate runner in the A-1 segregation unit in February 2012.  (Doc. 69-35, Gunn Depo., at 8, 24).  He was housed in the cell below plaintiff's and could talk to him through the vent.  (*Id.* at 45-46).  Gunn was concerned about

---

[5] Alex Walker also submitted a declaration, attached as an exhibit to his deposition.  (Doc. 80-4, DX 1).  In his declaration, Walker states that plaintiff repeatedly told corrections officers and nurses that he was seriously ill.  He also states that he and other inmates also told officers and nurses that plaintiff needed help.

plaintiff because he was not eating.  (*Id.* at 61-62).  When he looked in plaintiff's cell, he saw him balled up on his bed, holding his stomach.  (*Id.* at 64-65).  Gunn noticed that plaintiff had been throwing up, and it looked like there was some blood in the vomit because it was reddish.  (*Id.* at 65-68).  Gunn checked on plaintiff again, and plaintiff was bent over and asked Gunn to get an officer.  (*Id.* at 69).  Gunn told the officers assigned to the cubicle on February 12 (Mitchell) and 13 (Nunn), that plaintiff was "messed up" and could not get off the floor.  (*Id*. at 54-55).  Nunn told Gunn that she had called the infirmary and was waiting on a call back.  (*Id.* at 56).  Gunn told Nunn and other officers that plaintiff needed medical care and that he was not faking it.  (*Id.* at 58-59).  At one point, Gunn observed Nunn go to plaintiff's cell and talk to him.  (*Id.* at 81-82).  Gunn heard Nunn tell plaintiff she had called the infirmary.  (*Id.* at 83-84).  Gunn heard plaintiff moaning.  (*Id.* at 86).  Other inmates in the unit were hollering to try to get help for plaintiff while Nunn was the cubicle officer.  (*Id.* at 94, 138).

Kenneth Knabenshue was housed in the A-1 segregation unit at SCCF in February 2012, in the cell next to plaintiff.  (Doc. 69-30, Knabenshue Depo., at 8-9, 63).  He acknowledged that the segregation unit is loud, with inmates talking and hollering at all hours.  (*Id.* at 66-67).  Plaintiff told Knabenshue and some other inmates (Lawrence Walker and Chris Gunn), on the morning of February 12, that he

was hurting and sick, but the inmates did not take him seriously at first.  (*Id.* at 68-69,

72-74).  Once the inmates realized that plaintiff was truly in pain, at some point in the

afternoon of February 12, they began hollering to get him help, and Gunn (a runner)

went to the cubicle officer to tell the officer plaintiff needed medical help and was not

eating.  (*Id.* at 75-76, 79-82).  Knabenshue testified that at some point during

February 12, Northcutt came into the segregation unit and entered the cubicle, and

Lawrence Walker yelled to Northcutt that plaintiff needed to go to the infirmary.  (*Id.*

at 84-86).  Inmates continued to tell rovers and nurses coming into the segregation

unit that plaintiff needed help.  (*Id.* at 91-93).  On the afternoon of February 12,

plaintiff told the cubicle officer that he was hurting and had a knot coming out of his

stomach.  (Id. at 97-99).  Knabenshue stated that some inmates malinger, and some

officers did not take plaintiff seriously because he would carry on with officers and

was not "all there."  (*Id.* at 65, 93-94).  He also recalled one or more inmates hollering

at Northcutt out the back window of the unit that plaintiff needed medical help.  (*Id.*

at 103-07).

On February 13, Knabenshue and other inmates in segregation realized plaintiff

was not eating or responding.  (*Id.* at 115, 120).  Plaintiff refused food and cigarettes,

which was unusual for him.  (Id. at 119).  They again hollered, beat on their doors and

even threw things to try to get help for plaintiff.  (*Id.* at 118-19).  They also stopped

the pill call nurse. (*Id.* at 120, 140, 141-42). Knabenshue testified that plaintiff also told pill call nurses of his medical need. (*Id.* at 142-44). Plaintiff put his hand out of the tray hole in his cell door and got Nunn's attention. Knabenshue heard plaintiff tell Nunn that he had a knot on his stomach and was throwing up blood. (*Id.* at 123). Nunn told plaintiff she would do her best, and Knabenshue saw her get on the phone. (*Id.* at 123). After that, Knabenshue heard Nunn tell an inmate to tell plaintiff she had called, but whoever she spoke with said to fill out a sick call slip. (*Id.* at 123-25). By later in the day on February 13, plaintiff was not responding at all. (*Id.* at 126). Knabenshue heard Nunn say, in response to other inmates telling her that plaintiff was dying, that he would just have to die because she had done everything she could do. (*Id.* at 127).

On February 13, Knabenshue also heard other inmates yelling to Northcutt, who had entered the segregation unit, to get plaintiff some help. (*Id.* at 130-31). Later that day, Knabenshue saw Northcutt on the sidewalk outside the segregation unit and told him again that plaintiff needed medical care. Northcutt replied that he did not care because he was about to feed and go home, and that Knabenshue should tell the next shift. (*Id.* at 131-32).

On February 14, Officer Tish was doing routine sick call and Knabenshue told Tish that plaintiff need to be seen. At first, Tish was dismissive and said plaintiff was

a mental patient and would be all right.  Then, he returned, determined plaintiff was not responsive, and got him from his cell.  (*Id.* at 134-35).

Lawrence Walker was housed in A-1 segregation unit at SCCF in February 2012, in the cell across from plaintiff.  (Doc. 69-29, Walker Depo., at 64, 72).  Walker considers plaintiff an enemy.  (*Id.* at 76, 80).  During the weekend, plaintiff started groaning, and told Walker he was hurting and had a knot.  (*Id.* at 91-92).  Other inmates in the unit started yelling to the cubicle officer, Nunn.  She came to the walkway just outside the cubicle door to ask plaintiff what was wrong.  Plaintiff told her he was in pain and had a knot.  Nunn came to plaintiff's cell, but he told her he did not want to show her the knot because he would have to pull his pants down.  Other inmates in the unit asked Nunn to call the nurse and get plaintiff to the infirmary, and she returned to the cubicle.  Walker could not see if Nunn actually got on the phone, but Nunn then came back out and advised that the nurse said plaintiff should just sign up for sick call.  (*Id.* at 93-95).  When Walker and other inmates protested, Nunn said she had done what she could do by calling Ragdsdale.  (*Id.* at 96-98).  Walker testified that when the pill call nurse came into the unit after that, the inmates told the nurse that plaintiff was sick, but she would not even look at him.  (*Id.* at 99).  The inmates continued to yell and beat on their doors and told any officer or

nurse who came into the unit that plaintiff was sick but he was not speaking out for himself because he was in too much pain.  (*Id.* at 99-100).

By the morning of February 14, 2012, plaintiff was still not eating, which Walker considered unusual, and was groaning and moaning.  (*Id.* at 83).  Officer Tish finally got plaintiff to the infirmary.  (*Id.* at 118).

Brandon Simon was housed in the A-1 Segregation Unit in February 2012. (Doc. 69-33, Simon Depo., at 8, 10).  He recalls hearing plaintiff kicking his cell door and saying he needed to go to the infirmary.  (*Id.* at 40, 42).  Other inmates in the unit also were kicking their doors and telling Officer Nunn, the cubicle officer that plaintiff was hurting and needed help.  (*Id*. at 45-46).  Nunn eventually came out of the cubicle to ask what was wrong.  (*Id.* at 43, 63, 94).  Simon thought she said they would take plaintiff to the infirmary, but no one came for him.  (*Id.* at 43-45, 96-97). Chris Gunn also spoke with Nunn about plaintiff's condition (Id. at 100-01, 105).

## IV.  Discussion

Although it is not proper for this court to weigh the evidence when ruling on a motion for summary judgment, our courts have recognized that in certain circumstances a party's version of the facts can be discounted when it is blatantly contradicted by the record to such extent that "no reasonable jury could believe it." *Vicks v. Knight*, 380 Fed.Appx. 847, 851 (11th Cir. 2010), *citing Scott v. Harris*, 550

U.S. 372, 380 (2007). In *Vicks*, the Eleventh Circuit affirmed the granting of summary judgment in favor of prison guards, notwithstanding the fact that their version of events was in direct contradiction to the inmate's complaint and affidavit. Despite this apparent issue of fact, the court found that summary judgment was proper because the plaintiff's version of events was "contradicted by all the relevant evidence, with the exception of his own affidavit." *Id*. at 852. Defendants assert that summary judgment is appropriate because plaintiff's version of events is utterly contradicted by defendants' evidence.

In *Scott*, the district court denied summary judgment to a police officer who, during a chase, tapped the plaintiff's bumper and caused a crash which rendered the plaintiff quadriplegic. The district court held that the officer's actions could constitute "deadly force" and that the use of force in that context could violate the plaintiff's Fourteenth Amendment right to be free from excessive force during a seizure. The Supreme Court, in reversing the denial of summary judgment, found that the record included a videotape which established that the officer's use of force was reasonable under the circumstances. Therefore, the record "blatantly contradict[ed]" the plaintiff's version of events so that no reasonable jury could believe it, making the lower court in error for adopting the plaintiff's version of facts for summary judgment purposes.

In this case, unlike *Vicks*, the testimony of Alex Walker, Chris Gunn, Lawrence Walker, Kenneth Knabenshue and Brandon Simon also substantiates plaintiff's factual assertions. Further, unlike *Scott*, there is no videotape or other evidence blatantly contradicting plaintiff's version of events. In fact, defendants and their witnesses profess little to no independent recollection of the events of February 12 to 14, 2012, instead relying only on what is contained in the logs. They assert that if something like what plaintiff alleges had happened, it would have been noted in the various logs of the cubicle officers, rovers and pill call nurses. They rely on the absence of any such documentation to support their contention that plaintiff nor any other inmate in the segregation unit informed them that plaintiff was in serious pain, was vomiting and had a swelling pushing through his abdominal wall. However, Northcutt testified that correctional officers may not write everything in their duty post logs even though they are supposed to. (Doc. 71-1 through 71-4, Northcutt Depo., at 123, 154-55). It is also noted that the "912" form (the log sheet for all activity for a particular inmate, *see* Doc. 69-3, Nunn Depo., at 194) for plaintiff for the week of February 13 to February 19, 2012, is missing. *See* Doc. 71-2, Northcutt Depo., at 149-50). Therefore, defendants' reliance on these cases for their contention that plaintiff's version of events is wholly incredible and unworthy of belief by a reasonable juror, thereby entitling them to summary judgment, is unavailing.

## A.  Eighth Amendment Medical Claims

The plaintiff alleges that defendants failed to provide him with medical care for his hernia for two days and were, therefore, deliberately indifferent to his serious medical needs.  The United States Supreme Court has held that it is only deliberate indifference to serious medical needs which is actionable under 42 U.S.C. § 1983. *See Estelle v. Gamble*, 429 U.S. 97 (1976).  Indeed, the conduct of prison officials must run counter to evolving standards of decency or involve the unnecessary and wanton infliction of pain to be actionable under § 1983.  *See Bass v. Sullivan*, 550 F.2d 229 (5th Cir. 1977).  Mere negligence is insufficient to support a constitutional claim.  *See Fielder v. Brossard*, 590 F.2d 105 (5th Cir. 1979).  Moreover, an accidental or inadvertent failure to provide medical care, or negligent diagnosis or treatment of a medical condition, does not constitute a wrong under the Eighth Amendment.  *See Ramos v. Lamm*, 639 F.2d 559 (10th Cir. 1980).

Deliberate indifference can be shown in a variety of ways.  As the Eleventh Circuit Court of Appeals noted:

> Our cases have consistently held that knowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference.  Medical treatment that is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" constitutes deliberate indifference. Additionally, when the need for medical treatment is obvious, medical

care that is so cursory as to amount to no treatment at all may constitute
deliberate indifference.

*Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995) (internal citations omitted).

An official also acts with deliberate indifference when he intentionally delays
providing an inmate with access to medical treatment, knowing that the inmate has
a life-threatening or urgent medical condition that would be exacerbated by delay.
*See Hill v. DeKalb Reg'l Youth Detention Ctr.*, 40 F.3d 1176, 1186-87 (11th Cir.
1994), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002); *see also
Harris v. Coweta County*, 21 F.3d 388, 394 (11th Cir. 1994).  Delay in access to
medical treatment can violate the Eighth Amendment when it is "tantamount to
'unnecessary and wanton infliction of pain.'" *Brown v. Hughes*, 894 F.2d 1533, 1537
(11th Cir. 1990) (internal citations omitted).

In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court held that "a
prison official cannot be found liable under the Eighth Amendment for denying an
inmate humane conditions of confinement unless the official knows of and disregards
an excessive risk to inmate health or safety; the official must both be aware of facts
from which the inference could be drawn that a substantial risk of serious harm exists,
and he must also draw the inference." *Id*. at 837.  However, "an Eighth Amendment
claimant need not show that a prison official acted or failed to act believing that a

harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. Further, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable. *See Harris v. Coweta County*, 21 F.3d 388, 393-94 (11th Cir. 1994); *Brown v. Hughes*, 894 F.2d 1533, 1537-39 (11th Cir. 1990).

### 1.    Defendants Northcutt and Nunn

Defendants Northcutt and Nunn assert that they were never made aware of plaintiff's condition by plaintiff or any other inmates; therefore, they cannot have been deliberately indifferent to plaintiff's serious medical need. Alternatively, they argue that, even assuming that they were made aware of plaintiff's condition, they reasonably relied on the fact that plaintiff was being seen by the pill call nurses three times a day and already was scheduled to see Dr. Talley on February 14. They

assumed the nurses would properly evaluate plaintiff and determine if he needed to be seen more quickly.  They cite several cases in which similar scenarios resulted in a grant of summary judgment to the non-medical defendants because they knew the plaintiff already was being seen by medical personnel or were scheduled to see medical personnel in a short time.

In *McKeithen v. Jackson*, 606 Fed.Appx. 937 (11th Cir. 2015), the Eleventh Circuit affirmed the summary judgment in favor of correctional officer defendants because neither was medically trained to recognize the symptoms of stroke, and neither had subjective knowledge of a risk of serious harm to the plaintiff as a result of his having a stroke and disregarded that risk.

In *Taylor v. Vicky*, 337 Fed.Appx. 412 (5th Cir. 2009), an inmate's finger was partially severed when guards accidentally closed a cell door on it.  The guards immediately contacted prison medical staff and were advised an ambulance was being called.  When the ambulance did not arrive, the plaintiff and other inmates asked prison guards for help, but they failed to take any further action, relying on the fact that the medical staff already had been contacted.  Another nurse canceled the ambulance, and a guard informed the plaintiff of the cancellation and that a nurse would see the plaintiff after she had completed chronic care rounds.  Upon examining the plaintiff, the nurse then called for an ambulance again.  The Fifth Circuit affirmed

the summary dismissal of the complaint against the guards because they knew that the plaintiff's injury had previously been reported to medical staff and an ambulance was en route to the prison.

In *Pierce v. Carson*, 2014 WL 5643336 (N.D.Ala. Nov. 4, 2014), the plaintiff contracted a staph infection in his genitals. He signed up for sick call and was seen by the nurse and the doctor, who prescribed treatment. Thereafter, the plaintiff showed the warden how swollen his tissues were, and the warden contacted the medical department about the plaintiff's condition. He was informed that the plaintiff was already receiving treatment. In granting summary judgment for the warden on plaintiff's deliberate indifference claim, the court stated:

> "[S]upervisory officials are entitled to rely on medical judgments by medical professionals responsible for prisoner care." *Williams v. Limestone County, Ala.*, 198 Fed. App'x 893, 897 (11th Cir. 2006). Prison officials are not under a duty to directly supervise medical personnel or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional deprivation. *See Spruill v. Gillis*, 372 F.3d 218, 236 (3rd Cir. 2004) (in the absence of a reason to believe, or actual knowledge, that medical staff is administering inadequate medical care, non-medical prison personnel are not chargeable with the Eighth Amendment scienter requirement of deliberate indifference); *Antonelli v. Sheahan*, 81 F.3d 1422, 1428 (7th Cir. 1996) ("A prisoner may not attribute any of his constitutional claims to higher officials by the doctrine of *respondeat superior*; the official must actually have participated in the constitutional wrongdoing." (internal quotation marks and citation omitted)); *Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir. 1977) (a medical treatment claim cannot be brought against managing officers of a prison

absent allegations that they were personally connected with the alleged denial of treatment).

*Id.* at *9.

In *Fresquez v. Baldwin*, 2010 WL 5934891 (D.Colo. Dec. 15, 2010), the plaintiff was assaulted by another inmate. That same day, plaintiff complained to a deputy that he was getting a migraine and asked to be seen by medical personnel; he had a swelling between his right eyebrow and temple and scratches on his neck and shoulder. He was seen later that day by a nurse and given ibuprofen. The next day, the plaintiff was seen again by a nurse and given ibuprofen, and in response to the plaintiff's request for additional medical treatment for his complaints that he had a broken cheekbone, the nurse told the plaintiff he was on the list to see the doctor. The plaintiff alleges that a deputy was present when he asked to see the doctor, and he asked the deputy for a grievance form to protest the lack of medical treatment. The court granted summary judgment in favor of the deputy, finding that there was no evidence suggesting the deputy prevented or impeded the plaintiff's access to medical care, and that the deputy was entitled to rely on the nurse's statement to the plaintiff that he was on the doctor's list and the fact that she had given him ibuprofen.

In this case, viewing the evidence in the light most favorable to the plaintiff, Nunn and Northcutt were told by plaintiff and other inmates that plaintiff was in

severe and increasing pain and vomiting blood. The testimony from Nunn is that if she was told by an inmate that he needed to go to the infirmary or by a rover who had received such a complaint from an inmate, she would arrange for rovers to escort the inmate to the health care unit. (Doc. 69-3, Nunn Depo., at 63, 170-71). However, she also testified that if an inmate requested to go to the infirmary, she would call the nurse and the nurse would decide if she would see the inmate. (*Id.* at 173-75). Nunn was able to view the cells and the nurses conducting pill call; therefore, she would have been aware that those nurses were not entering plaintiff's cell to examine him. She also would have been aware that plaintiff was not being taken to the health care unit on orders from any nurse. If she was aware that plaintiff was in pain and vomiting blood, she should have arranged for him to taken to the health care unit for examination by a nurse. Instead, she disavows any awareness that plaintiff was in distress, despite the testimony from plaintiff and other inmates that they indeed told her of his pain and need to be seen by, at least, a nurse. She also denies placing any call to Nurse Ragsdale on plaintiff's behalf, based on the claimed lack of awareness of plaintiff's condition. That she may have known plaintiff was supposed to be seen in the infirmary on February 14 does not necessarily justify waiting to have plaintiff examined in person by a nurse, given the reports she received about his condition.

The same analysis is true as to Northcutt.  While he has testified that he does not recall plaintiff or any other inmate telling him that plaintiff was in severe pain and needed medical help, plaintiff, Knabenshue, Alex Walker and Lawrence Walker have testified that they or other inmates indeed told Northcutt of plaintiff's condition and asked him to help get plaintiff to the infirmary.  Therefore, there is a genuine issue of material fact as to Northcutt's knowledge of plaintiff's serious medical need and whether he simply ignored the pleas for help because he thought plaintiff was a dangerous and disruptive inmate.

## 2.     Defendant Ragsdale

Defendant Ragsdale argues that she is entitled to summary judgment because she had no subjective knowledge that plaintiff had a serious medical need before he was taken to Cooper Green Hospital for emergency hernia surgery.  She contends plaintiff has not offered evidence that Ragsdale had knowledge that plaintiff had a serious medical need and ignored that need, claiming there is no evidence about what Nunn allegedly told Ragsdale.

The evidence about Ragsdale's involvement in this matter is in sharp dispute.  On the one hand, Ragsdale denies ever having received a call from correctional personnel about plaintiff's condition.  Further, Nunn denies ever having placed a call to Ragsdale about plaintiff.  On the other hand, the testimony of Walker, Knabenshue

and Gunn is that Nunn did place a call to Ragsdale, but then reported to them that Ragsdale refused to see plaintiff and told him to sign up for sick call. The email exchange also indicates that Ragsdale was called about plaintiff, but she simply responded to whoever called her that he should sign up for sick call. Ragsdale's argument misses an important point–plaintiff and the other inmates all testified that they told Nunn that plaintiff was in severe pain and throwing up blood and needed to see someone on the medical staff. A reasonable inference may be drawn that if the description to Nunn of plaintiff's condition was as they testified, Nunn would have conveyed that information to Ragsdale in any phone call. Whether that inference is drawn is up to a jury. Further, Nunn has testified that it was standard that if an inmate expressed a serious medical need, that inmate would be taken to the health care unit.

Ragsdale has argued that any testimony about what she may have said to Nunn, as reported by Nunn to the inmates in the segregation unit, is double hearsay and thus inadmissible. However, the evidence still reflects that Nunn told the inmates she would call the infirmary, was seen on the telephone in the cubicle, and then reported that she had actually called the infirmary where Ragsdale was on duty. The evidence is also that no one ever escorted plaintiff to the infirmary until Officer Tish came to get him for an already-scheduled sick call on the morning of February 14. Further, the evidence from the email exchange is that Ragsdale was called about plaintiff but

refused to see him and advised that he should sign up for sick call. Therefore, the jury still could infer that Nunn called Ragsdale about plaintiff and Ragsdale refused to see him.

## IV. Recommendation

Accordingly, for the reasons stated above, the magistrate judge **RECOMMENDS** that defendants' motions for summary judgment be **DENIED** because of the existence of genuine issues of material fact.

## V. Notice of Right to Object

Any party who objects to this report and recommendation must, within fourteen (14) days of the date on which it is entered, file specific written objections with the clerk of this court. **Any objections to the failure of the magistrate judge to address any contention raised in the petition also must be included.** Failure to do so will bar any later challenge or review of the factual findings of the magistrate judge, except for plain error. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, (1985), *reh'g denied*, 474 U.S. 1111 (1986); *Dupree v. Warden*, 715 F.3d 1295, 1300 (11th Cir. 2013).

To challenge the findings of the magistrate judge, a party must file with the clerk of the court written objections which shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the

specific basis for objection.  Any objections to the failure of the magistrate judge to address any contention raised in the complaint also must be included.  Objections not meeting the specificity requirement set out above will not be considered by a district judge.   The filing of objections is not a proper vehicle through which to make new allegations or present additional evidence.  Furthermore, it is not necessary for a party to repeat legal arguments in objections.  A copy of the objections must be served upon all other parties to the action.

On receipt of objections meeting the specificity requirement set out above, a United States District Judge shall make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the magistrate judge.  The district judge, however, need conduct a hearing only in his discretion or if required by law, and may consider the record developed before the magistrate judge, making his own determination on the basis of that record.  The district judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.  Objections not meeting the foregoing specificity requirement will not be considered by a district judge.

A party may not appeal a magistrate judge's recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  Appeals may be made only from a final judgment entered by or at the direction of a district judge.

DATED this 14th day of March, 2016.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE